LABORDE, Judge.
The State of Louisiana, through the Department of Transportation and Development (DOTD) appeals a decision finding it liable to plaintiff, Johnny G. Cosper, for damages he suffered in a vehicular collision. We find no error in the judgment below, and therefore affirm.
On February 22, 1981, Cosper’s motorcycle collided with a car driven by Ernest Bourgeois on a one-way service road in Lafayette Parish. Cosper sued DOTD under La.Civ.Code art. 2317, alleging that the road had no signs to indicate that it was a one-way road, and that it was therefore unreasonably dangerous. DOTD filed a third party demand against Bourgeois and against Barber Brothers Contracting Company, Inc. Bourgeois entered into a settlement and release with plaintiff, and was thereafter dismissed from the third party demand by summary judgment. The claim against Barber Brothers was dismissed pursuant to a motion for directed verdict. No appeal has been taken from either of the two actions dismissing Bourgeois and Barber Brothers.
FACTS
On the day of the accident, plaintiff was driving his motorcycle south on Highway 167 in Lafayette Parish. At that time, Highway 167 was a four-lane roadway undergoing construction to change it into a limited access thoroughfare (U.S. Interstate 49) running north-south. Prior to the accident, a service road had been completed on both the east and the west sides of the four-lane roadway. Both service roads were originally designed to accommodate two-way traffic. In December, 1980, Barber Brothers contracted with DOTD to perform work on Highway 167 between its intersections with Highway 182 to the north, and with Highway 726 to the south. The job required that regular highway traffic be rerouted onto the two service roads. This was accomplished in December, 1980 by converting the west service road into a one-way road for traffic going south, and by converting the east service road into a one-way road for traffic going north. Regular southbound traffic on Highway 167 was detoured onto both lanes of the west service road near the intersection of Highways 167 and 182. Plaintiff, traveling south on Highway 167, detoured onto the west service road near Highway 182 and remained in the right lane for a short time. At the same time, Ernest Bourgeois was driving his car on the west service road in a northerly direction, that is, against the one-way flow of traffic. The two drivers did not see each other until plaintiff emerged from behind another car which he was attempting to pass. Plaintiff made an unsuccessful attempt to avert Bourgeois. A collision occurred and plaintiff was thrown by the resultant impact into a ditch. Bourgeois continued driving north, slowly and in a daze, until he was stopped by a witness to the accident, Larry Carriere. Carriere had been following plaintiff on the service road when the collision occurred. He told Bourgeois that the road was for southbound traffic only. Bourgeois answered that he did not think the service road was for one-way traffic.
As a result of the accident, plaintiff suffered the loss of his leg, which required amputation just below the knee, great pain, and lost wages. The trial court found plaintiff 25% contributorily negligent and found Bourgeois 25% negligent. DOTD was adjudged 50% liable and was con *245 demned to pay plaintiff $213,727.60 plus costs.
LAW
One may recover on the basis of strict liability under La.Civ.Code art. 2317 by showing 1) that the thing which caused the damage was in the care or custody of defendant; 2) that it had a vice or defect, i.e., some condition which occasioned an unreasonable risk of injury; and 3) that the injury was caused by the defect. Jones v. City of Baton Rouge—Parish of East Baton Rouge, 388 So.2d 737 (La.1980); Holmes v. State Through Department of Highways, 466 So.2d 811 (La.App. 3d Cir.), writ denied, 472 So.2d 31 (La.1985).
DOTD argues initially that the highway was not defective as a matter of law. The argument is based on testimony of DOTD witnesses, some of whom directed the signing of roads, and others who actually erected signs for DOTD. There was testimony to the effect that the proper signing of a temporary crossing, from which Bourgeois wrongfully entered the service road, required, at a minimum, a stop sign on the right at the intersection of the crossing and the service road, and two one-way signs, one on the far left side of the service road and one at the near right side of the service road. There was also testimony from the DOTD witnesses to the effect that the necessary signs, including two wrong-way signs between thirty and fifty yards north of the intersection on the service road, were in place in December, 1980, when the service road was converted to one-way use.
The testimony of plaintiff’s witnesses contradicted the testimony of DOTD’s witnesses. Larry Carriere testified that he was traveling south on the service road and could see plaintiff on a motorcycle immediately prior to the accident. Carriere arrived at the accident scene seconds after the impact. After plaintiff had been taken to the hospital in an ambulance, Carriere left the accident scene, traveling south on the service road, and expressly looked for one-way signs south of the accident scene on the service road; he did not, however, see any such signs.
Mr. Leo Burleigh testified that he was traveling south on the service road in the right lane just prior to the accident. He saw Mr. Bourgeois’ car pass him going north in the left lane and looked in his rearview mirror and observed the collision between plaintiff’s motorcycle and Mr. Bourgeois’ automobile. He returned to the scene of the accident to render aid and a few moments later continued south on the service road, expressly looking for one-way signs at the temporary shell crossing and at other points. He did not see any.
Mr. Joseph Lalonde testified that he was Mr. Bourgeois’ son-in-law and that he arrived at the accident site approximately thirty minutes after the accident. Mr. Bourgeois got in Mr. Lalonde’s automobile to be driven home. They traveled south on the service road. Mr. Bourgeois pointed out to Mr. Lalonde the gravel crossover where Mr. Bourgeois had turned right onto the service road. Mr. Lalonde pulled over and expressly looked for one-way signs, but did not see any.
Mr. Armand Bourgeois, the son of Mr. Ernest Bourgeois, testified that he followed his father and Mr. Lalonde home from the accident scene in his own automobile and also looked for signs, but did not see any one-way signs on the service road. However, both Mr. Lalonde and Mr. Armand Bourgeois testified that they did see the wrong-way signs on the service road.
Mrs. Barbara Latour testified that she traveled north on the west service road one or two days prior to the accident and did not see any one-way signs. She was not aware that it was a one-way thoroughfare until she was informed of that fact by her son-in-law, Byron Boudreaux, at Mr. Bou-dreaux’s home located at the intersection of Patín Road and the west service road.
The trial judge carefully reviewed all of the testimony and found, as do we, that it preponderates in favor of plaintiff and against DOTD. The trial judge is in the best position to evaluate the testimony *246 of witnesses who appeared before him, and a reasonable evaluation of credibility should not be disturbed on appeal. Moore v. Magnon, 432 So. 2d 1137, 1138 (La.App. 3d Cir.1983). Factual conclusions of the trial judge are entitled to great weight and will not be disturbed on appeal unless clearly wrong. Dugas v. Mouton, 460 So.2d 739, 742 (La.App. 3d Cir.1984). We conclude, as did the trial judge, that the service road was not signed in accordance with DOTD’s own signing plan. There were no one-way signs to alert Bourgeois to the fact that he was about to enter a one-way road in the wrong direction. While there were wrong-way signs on the service road facing south, they were placed north of the point of impact. The wrong-way signs were apparently close enough to the point of impact to permit Bourgeois to see them. If Mr. Bourgeois saw them at all, however, his testimony by deposition established that, since he spoke and understood very little English (Bourgeois himself died subsequent to the accident of unrelated causes), he probably could not decipher them.
The legal issue of whether the inadequately signed, one-way road was unreasonably dangerous as a matter of law is one which we decide just as did the trial judge. In determining the reasonableness or unreasonableness of a risk, we must consider the probability and magnitude of the risk against the utility of the thing alleged to be unreasonably dangerous. "The establishment of the one-way detour was undeniably useful, for it was necessary to effectuate the modification of the main thoroughfare. The probability that its unsigned condition would cause accidents, however, was very high. This case illustrates the magnitude of harm occasioned by the defect. We will reproduce the trial judge’s excellent reasons for judgment insofar as they pertain to the plaintiff’s injuries and the apportionment of fault.[1] They leave no room for argument as to the magnitude of the harm suffered partly as a result of the inadequately signed road.
DOTD next alleges that the plaintiff’s injuries resulted from either plaintiff’s failure to take action to avoid the accident or from a combination of plaintiff fault and the fault of a third person, that is, Ernest Bourgeois.
We agree with the trial judge that plaintiff was only partially responsible for the accident. He was traveling well over the speed limit, as he admitted, and might have reduced the damage had he observed Bourgeois traveling against the traffic flow. Plaintiff’s recovery was properly reduced by 25%. La.Civ.Code art. 2323.
We also reject DOTD’s argument that the sole cause of the accident was some combination of victim and third party fault. We view the accident as having resulted primarily from the unreasonably dangerous condition of the road, and secondly from Bourgeois’ failure to note the wrong-way signs located north of his point of entry. Plaintiff’s responsibility has already been discussed.
No argument has been made that the quantum of recovery by plaintiff was either inadequate or excessive. We nonetheless deem it appropriate to reproduce the trial judge’s reasons for judgment insofar as they relate to the quantum of recovery and to the apportionment of damages.[2] The reasons are fully supported by the record.
*247 For the above and foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to DOTD.
AFFIRMED.
APPENDIX A
“The Court notes that Mr. Cosper suffered severe physical pain as a result of this accident. He sustained significant soft tissue crushing, broken bones and circulatory damage to the left foot. He was treated by Dr. Cobb in the emergency room on the date of the accident, who cleaned the area and performed a surgical procedure and inserted pins into the different bones that had been broken in the foot. Thereafter, Dr. Cobb and Dr. Louis C. Blanda, Jr., performed two surgical procedures under general anesthesia on Mr. Cos-per to change the dressings and debride the foot. On the third surgical procedure on March 5, 1981, Dr. Blanda found that gangrene was developing in the foot as well as an infection, due to lack of circulation in the area. Dr. Blanda testified by deposition that Mr. Cosper was in substantial pain through this period of time.
Dr. Blanda prepared Mr. Cosper for an amputation of his foot due to the gangrenous changes and a few days later plaintiff underwent a fourth surgery at which time his foot was amputated at the ankle joint. A few days later Dr. Blanda found that the lower leg still had no circulation at all and a fifth surgical procedure was performed at which time a second amputation along the mid-part of the tibia was performed. This was at a level approximately six or seven inches below the knee.
Dr. Blanda testified that throughout Mr. Cosper’s hospital stay, he suffered such severe pain and psychological distress that a psychiatrist, Dr. Regan, had to be consulted to help Mr. Cosper with his emotional and pain problems to help him deal with the fact that he lost his leg as well as the pain he was suffering.
After the fifth surgery Mr. Cosper was released from the hospital and Dr. Blanda first saw him in the office on April 1,1981. Dr. Blanda found that Mr. Cosper was doing very well at that time and had an excellent mental adjustment to his amputation and his pain was greatly relieved.
Dr. Blanda next saw Mr. Cosper on April 20, 1981, at which time plaintiff was developing a neuroma, that is scar tissue and enlargement around the end of the nerve where the nerve and skin meet at the stump of the leg, which can be very painful and is usually very sensitive. On that date Dr. Blanda began Mr. Cosper on physical therapy and ordered a prosthesis, an artificial limb, for Mr. Cosper.
From April, 1981 to September, 1981, Mr. Cosper was on crutches. In September, 1981, he began to use his artificial leg. Thereafter, ulcers began developing at the stump of his leg which caused significant pain and discomfort such that there was a breakdown in the area of the skin at the tip of the amputation. Therefore, a sixth and final surgery was performed in August, 1982, at which time an additional one' to two inches were amputated. Mr. Cosper had a normal recovery after that final surgery and began to wear his artificial leg again in October, 1982.
Dr. Blanda saw Mr. Cosper a final time in June, 1983, at which time the stump of the leg was slipping up and down in the prosthesis causing wearing. Therefore, Dr. Blanda had the artificial limb re-fitted.
Dr. Blanda estimates that Mr. Cosper has a 75% disability from running, jumping, etc. and any other vigorous activity, and estimates that Mr. Cosper has a 25% permanent overall disability.
Since October, 1982, Mr. Cosper has worn his artificial limb but periodically develops ulcers at the stump of the leg such that every two to three months he must take the artificial limb off and do without it for a week or more at a time.
Prior to the accident plaintiff was very physically active and enjoyed fishing and hunting both personally and in connection with entertaining clients as an integral part of his career in oilfield sales. Since the accident he is unable to perform these and any other physical activities because of his *248 immobility with and without the artificial limb. While he cannot get the artificial limb wet, he can swim without it for enjoyment and exercise, however, he cannot be around a pool with his crutches as this is a dangerous situation.
Dr. Blanda testified that when he last spoke to Mr. Cosper, plaintiff was still quite depressed about some of the physical activities that he could no longer perform, but was very aggressive at trying to adjust to his handicap. Further, Dr. Blanda would normally expect an amputee to have some psychological problems, but he felt Mr. Cosper adjusted to them better than most people. The Court notes that while Mr. Cosper had returned to work in April, 1981, Dr. Blanda first learned Mr. Cosper was again working in October, 1982, although he had not released Mr. Cosper back to work at that time. However, Dr. Blanda was not surprised that Mr. Cosper went back to work because he worked hard to rehabilitate himself, in keeping with his personality and aggressiveness in adjusting to his handicap.
In view of the above, the Court finds that Mr. Cosper has suffered substantial physical pain as a result of this accident, as well as significant mental and psychological problems adjusting to his amputation and handicap. Further, plaintiff has had to abandon his active physical outdoor lifestyle and can no longer engage in the aggressive activities he once enjoyed. In view of the above, the Court awards Mr. Cosper $200,000.00 for mental and physical pain, suffering, and loss of his leg.
Plaintiff has admitted into evidence bills totalling $21,239.88 for past medical expenses which he has proven were incurred as a result of this accident. Therefore, the Court awards that amount to plaintiff for past medical expenses incurred.
Dr. Bernard F. Pettingill, Jr. testified as an expert in the field of economics for the plaintiff, and stated that Mr. Cosper has an additional forty-two (42) year life expectancy at the date of trial. While Dr. Blanda testified that Mr. Cosper will require a new artificial limb approximately every year as a result of his extensive use and activities on the artificial limb, Mr. Cosper testified that he would have to replace the artificial limb approximately every three years at a cost of between $1,150.00 and $1,200.00. Therefore, the Court awards Mr. Cosper the sum of $16,000.00 for future medical expenses for additional artificial limbs. The Court accepts the testimony of Dr. Blanda that Mr. Cosper will probably not incur any additional medical expenses for his leg during the course of his life.
Dr. Pettingill testified, and the evidence establishes, that Mr. Cosper earned approximately $25,000.00 in 1980, and earned approximately $35,000.00 in 1981, the year of the accident. Thereafter, plaintiff earned approximately $25,000.00 in 1982, was unemployed in 1983, and earned approximately $18,000.00 in 1984. In calculating plaintiffs past lost wages to the date of trial, Dr. Pettingill used a figure of $14,400.00 as an amount Mr. Cosper would have to pay an outside salesman while Mr. Cosper remained active as an inside salesman or executive in oilfield sales. The Court rejects Dr. Pettingill’s theory that plaintiff would have to pay for an additional outside salesman, and accepts the testimony that, while Mr. Cosper’s income increased from 1980 to 1981 after the accident, that increase was substantially due to the vigorous selling endeavors conducted and contacts made prior to February 22, 1981. Therefore, the difference between plaintiff’s 1981 income and his 1982 income of $9,795.00 is accurate and representative of plaintiff's loss of income due to this accident. Using Dr. Pettingill’s calculations and the lower sum of $9,795.00 per year, the Court awards plaintiff $17,630.00 for past lost wages from the date of the accident to the date of trial.
The Court finds that plaintiff has a future loss of $9,795.00 per year resulting from this accident. Using that amount in connection with his calculations, Dr. Pettin-gill calculated future lost income at a 9.25% discount rate and a 5% annual increase for future work life expectancy for Mr. Cosper of 28 years, and testified that Mr. Cosper’s *249 total future lost wages are $172,585.32. The Court accepts this figure as the amount plaintiff will suffer in the future for lost wages, and therefore awards Mr. Cosper $172,585.32 for future lost income.
The amount of damages due to plaintiff must be reduced under the theory of comparative negligence. Mr. Carriere testified that while he was on Highway 167 he saw plaintiff stopped on the side of the road at the Sunset Interchange on his motorcycle speaking to someone in a white truck. Mr. Carriere testified that he was traveling at 58 miles per hour when he passed plaintiff at that time and continued to do 58 miles per hour after he detoured onto the service road. Plaintiff passed Mr. Carriere on his motorcycle thereafter, and Mr. Carriere observed Mr. Cosper ahead of him at a distance of approximately 700 to 800 yards when the accident occurred. While Mr. Cosper testified that he stopped at the Sunset Interchange and resumed riding the motorcycle at that point he stated that he was traveling between 50 and 60 miles per hour on the service road and did not go over 60 miles per hour prior to the accident. This testimony is contradicted by the weight of the evidence.
Mr. Deranger testified that, as the project engineer for the section of roadway where the accident occurred, he measured the distance from the detour onto the service road at the Sunset Interchange to the intersection of Patin Road and the service road, and found this distance to be between Vioths and %oths of a mile, and the roadway was straight. The Court accepts the testimony of Mr. Carriere that he was driving at 58 miles per hour and observed plaintiff stopped at the Sunset Interchange and then plaintiff passed him traveling at least 8 to 10 miles per hour faster than Mr. Carriere, who watched Mr. Cosper until he was approximately 700 to 800 yards ahead of Mr. Carriere’s vehicle. Therefore, plaintiff was traveling at least 66 to 68 miles per hour, and possibly faster, immediately prior to the accident, which is far in excess of the speed limit.
The Court notes that plaintiff testified that he was 40 to 50 feet behind another vehicle when Mr. Bourgeois passed the other vehicle. At that point plaintiff realized that Mr. Bourgeois was going the wrong way. He stated that Mr. Bourgeois was traveling approximately 25 miles per hour, but he did not have time to avoid the accident. In view of plaintiff’s excessive speed at the time of the accident, and his failure to see Mr. Bourgeois’ vehicle traveling in the left lane, in the wrong direction until the very last instant, the Court finds that Mr. Cosper was 25% negligent in contributing to his own accident and injury.
The Court has noted that Mr. Bourgeois traveled south on the west service road earlier in the day and thought it was a two-way thoroughfare. In returning later that afternoon he traveled the same route he had used earlier in the day, and because there were no one-way signs or other traffic signs indicating that he should not turn north onto the west service road, Mr. Bourgeois traveled against the flow of traffic. The Court finds that Mr. Bourgeois was 25% negligent in contributing to the accident and injuries sustained by Mr. Cosper.
In view of the above, the Court reduces the award to Mr. Cosper 25% for Mr. Cos-per’s own negligence and 25% for the negligence of Mr. Ernest Bourgeois. Therefore, the award is reduced by 50% and judgment is rendered in favor of Mr. Johnny G. Cos-per and against the State of Louisiana through the Department of Transportation and Development in the total amount of $213,727.60, with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings, including court reporter’s fees.
Expert witness fees are assessed as court costs and are fixed as follows:
1) Dr. Bernard F. Pettingill $150.00
2) Dr. Roger L. Burford $150.00
3) Dr. Louis C. Blanda, Jr. $150.00
Judgment will be signed upon presentation.
*250 Thus Rendered and Signed in Chambers, at Crowley, Louisiana, on this 8th day of May, 1985.
Don Aaron, Jr.” DISTRICT JUDGE

. Reasons for Judgment are attached, in part, as Appendix A.

. We do think it important, however, to underscore the fact, unmentioned by the tried judge, that DOTD and Bourgeois were solidarity liable for plaintiffs injuries (after a 25% reduction for victim fault). La.Civ.Code arts. 2323 and 2324. DOTD’s liability to plaintiff in this case for its virile share alone (50%) results from the fact that plaintiff executed a compromise agreement with DOTD’s co-obligor, Ernest Bourgeois, which effected a release of Bourgeois from all claims and a reduction of plaintiffs recovery from DOTD to the extent of Bourgeois’ virile share of liability. Wall v. American Employers Insurance Company, 386 So. 2d 79 (La.1980); Ainsworth v. Government Employees Insurance Company, 427 So.2d 1220 (La.App. 3rd Cir.1983).